MONA GROSS & another[1] *vs.* PRUDENTIAL INSURANCE
COMPANY OF AMERICA, INC.

No. 98-P-1015.

Suffolk. December 3, 1998. - October 21, 1999.

Present: WARNER, C.J., LAURENCE, & BECK, JJ.

*Landlord and Tenant,* Rent. *Rent Control,* Rent increase, Prohibition. *Statute,*
Construction. *Contract,* To guarantee rent payments, Construction of
contract. *Words,* "Publicly subsidized housing."

Apartment buildings constructed in Boston in accordance with the provisions
and purposes of G. L. c. 121A were not "publicly subsidized housing" so
as to be exempt under G. L. c. 40P, § 3(c), from the abolition of rent
control. [119-121]

A Superior Court judge correctly ordered summary judgment in favor of a
landlord on the tenants' claim that the landlord had contracted to preserve
for a period of years the rent-controlled status of certain apartment build-
ings notwithstanding G. L. c. 40P, § 3(c), where the asserted agreement
contained no reference to rent control but rather undertook to guarantee the
units would remain rental units rather than be converted to condominiums
or cooperatives. [121-123]

CIVIL ACTION commenced in the Superior Court Department on
December 15, 1995.

The case was heard by *Peter M. Lauriat,* J., on motions for
summary judgment.

*Peter Antell (Robert Feigin* with him) for the plaintiffs.

*John Kenneth Felter (Jonathan S. Klavens* with him) for the
defendant.

BECK, J. The plaintiffs are tenants in one of three residential
apartment buildings constructed in the mid-1960's as part of the
Prudential Center on Boylston Street in Boston. The defendant,
Prudential Insurance Company of America, is the owner and
developer of the Prudential Center and the plaintiffs' landlord.

___

[1]Robert Raffauf. Maury A. Bromsen was one of the original plaintiffs, but
he was dismissed from the case below.

When the voters of the Commonwealth elected to repeal rent control in 1994, the defendant notified the plaintiffs of a gradual rent increase. In response, the plaintiffs filed suit claiming that, because the defendant had received a public subsidy in the form of tax exemptions to build the Prudential Center, their apartments were "publicly subsidized" and therefore the law abolishing rent control did not apply to them. The plaintiffs also claimed that the rent increase was a breach of an agreement with the defendant to maintain the "rental status" of their apartments. A Superior Court judge rejected these arguments and granted summary judgment to the defendant. We affirm.

1. *Factual and statutory background.* We set out the broad principles governing the construction of the Prudential Center and the course of rent control legislation, reserving certain details for the discussion. In March, 1962, the defendant entered into a contract with the city of Boston (Boston) to "finance, construct, maintain and manage a redevelopment project, known as the Prudential Center complex, in the Back Bay area of Boston . . . . in accordance with the provisions and purposes of G. L. c. 121A." *Prudential Ins. Co. of America* v. *Boston,* 369 Mass. 542, 543 (1976). Chapter 121A was enacted in 1945 to encourage privately financed projects to redevelop "blighted open, decadent or sub-standard areas" in order to provide "decent, safe and sanitary buildings for residential, commercial, industrial, institutional, recreational, or governmental purposes." G. L. c. 121A, § 2. To encourage the necessary private investment, "the statute provides that a project undertaken by a qualified applicant, such as an insurance company, is exempt from State and local taxation, including betterments and special assessments, for a period of forty years." *Prudential Ins. Co. of America* v. *Boston, supra.* In place of taxes, the defendant made annual payments to the city as set out in agreements with the city and consistent with G. L. c. 121A, § 10. See *Prudential Ins. Co. of America* v. *Boston, supra* at 543-544. The defendant's original proposal "reserved a future option to construct residential units within the project area. In 1965, the mayor and the BRA [Boston Redevelopment Authority] approved [the defendant's] plans to build [the] three residential rental apartment buildings" at issue here. *Bronstein* v. *Prudential Ins. Co. of America,* 390 Mass. 701, 702 (1984).

In 1970, the Legislature enacted an enabling statute authorizing certain cities and towns to institute rent control by setting

maximum rents for controlled rental units. St. 1970, c. 842, § 3. According to the preamble, the purpose of this legislation was "to alleviate the severe shortage of rental housing," specifically the "substantial and increasing shortage of rental housing accommodations for families of low and moderate income." St. 1970, c. 842, § 1. Boston accepted the provisions of the rent control act effective January 1, 1973. *Prudential Ins. Co. of America* v. *Boston*, 369 Mass. at 544. The rent control law applied to the apartments in the Prudential Center. *Id.* at 550.

In 1989, as part of its plan for a major redevelopment of the Prudential Center, the defendant petitioned the BRA to terminate the Prudential Center's designation as a 121A project. To address the concerns of the tenants, the BRA required that the defendant agree to maintain the "rental status" of the apartments under G. L. c. 121A until August 31, 2001, the expiration of the original 121A project period. In exchange for this commitment, the Prudential Apartments Association, a tenants' organization, testified in support of the defendant's redevelopment plan at the required hearing before the BRA on December 14, 1989. On August 2, 1991, the defendant "executed" a one-page document entitled "AGREEMENT AS TO RENTAL STATUS OF RESIDENTIAL PROJECT — PRUDENTIAL CENTER APARTMENT BUILDINGS."

At the election of November 8, 1994, the voters of the Commonwealth enacted the Massachusetts Rent Control Prohibition Act by initiative petition pursuant to art. 48 of the Amendments to the Constitution of the Commonwealth. St. 1994, § 368. See G. L. c. 40P.[2] The purpose of the act was "to establish a uniform statewide policy that broadly prohibits any regulatory scheme based upon or implementing rent control." G. L. c. 40P, § 2. The statute's definition of the rent control arrangements to be eliminated excluded "the regulation of, or agreements affecting, publicly owned housing, publicly subsidized housing, federally assisted housing, or mobile homes." G. L. c. 40P, § 3(*c*).

Shortly after the passage of the initiative petition, the Legislature enacted a "limited transitional statute . . . . provid-[ing] for certain rights and procedures in order to bring about the orderly termination of rent control." *Zuker* v. *Clerk-*

---

[2]The act was first codified as chapter 40O despite the fact that a different chapter 40O already existed. A technical amendment redesignated the act as chapter 40P, retroactively effective as of January 1, 1995. See St. 1997, c. 19, §§ 10, 127.

*Magistrate of the Brookline Div. of the Dist. Ct. Dept. of the Trial Ct.*, 423 Mass. 856, 859 (1996). See St. 1994, c. 282. This law specifically identified the Boston rent control ordinance, among others, as having been repealed. St. 1994, c. 282, § 3(*e*). It also specified, as relevant here, that "the provisions of this act [shall not] be deemed to limit the operation and enforceability of agreements . . . entered into by landlords in connection with the procuring of any subsidy or other form of financial assistance from a governmental agency." *Ibid.*

In August, 1995, the defendant notified the plaintiffs of a proposed rent increase. The plaintiffs responded by filing a complaint on December 15, 1995, seeking a declaratory judgment that, because of the tax relief provided to the defendant under G. L. c. 121A, their apartments are "publicly subsidized housing" and therefore not within the definition of the rent control program abolished by G. L. c. 40P, § 3(*c*). Two years later, the parties filed cross motions for summary judgment. The plaintiffs also filed a late motion to amend their complaint by adding a contract count. A Superior Court judge allowed the plaintiffs' motion to amend, denied their motion for summary judgment, and allowed the defendant's motion for summary judgment.

The judge found that G. L. c. 40P, § 3(*c*), reflected the Legislature's "intent that the prohibition on rent control would not affect the administration of rent restrictions in other subsidized housing programs." He distinguished between the statutory structure and purposes associated with c. 121A and the rent control statutes and determined that the Prudential Center apartments were not publicly subsidized housing and therefore were not exempt from the law abolishing rent control. As to the contract claim, the judge found that the phrase "rental status" was not ambiguous and only "memorialized [the parties'] intent to maintain the apartments as rental units until August 31, 2001, as opposed to converting the rental units to condominium or cooperative units." Accordingly, he also rejected the plaintiffs' contract claim.

2. *Discussion.* (*a*) *Standard of review.* Summary judgment is proper when there is no genuine issue of material fact or when resolution of the case depends solely on answers to questions of law. See *Cassesso* v. *Commissioner of Correction*, 390 Mass. 419, 422 (1983). In the absence of an express definition, the meaning of a word or phrase used in a statute is a question of

law, and is to be determined by the ordinary principles of statutory construction. See *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283, 290 (1981). "The interpretation of a contract [also] presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." *USM Corp.* v. *Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 116 (1989) (citations omitted). On review, we may affirm on grounds other than those given by the Superior Court judge. *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993).

   (b) *Publicly subsidized housing.* Section § 3(c) of G. L. c. 40P excludes from the definition of rent control arrangements to be abolished "the regulation of, or agreements affecting . . . publicly subsidized housing." However, the statute does not define publicly subsidized housing. The plaintiffs claim that the defendant's agreement with Boston for favorable tax treatment under G. L. c. 121A is an "agreement[] affecting . . . publicly subsidized housing" because the defendant received a public subsidy in the form of a tax exemption, see *Opinion of the Justices*, 401 Mass. 1201, 1204 (1987), and their apartments are clearly housing. The Superior Court judge concluded that "in order for these subsidies to fall within the narrow exception to G. L. c. 40P, plaintiffs must show that Prudential received its tax exempt status as part of a program of publicly subsidized *housing*" (emphasis in original). It is this issue to which we turn our attention.

   Our analysis of laws and regulations relating to "publicly subsidized housing" persuades us that the term refers to housing provided to low and moderate income tenants at rents below market rates made possible by a public subsidy of some sort. In effect, the subsidy is passed along to the tenant. For example, the Supreme Judicial Court recently considered the validity of a Department of Transitional Assistance regulation providing that "persons who have been evicted from public or subsidized housing for nonpayment of rent are ineligible to receive benefits under the . . . emergency assistance . . . program." *Dowell* v. *Commissioner of Transitional Assistance*, 424 Mass. 610, 610-611 (1997) (considering 106 Code Mass. Regs. § 309.040[A][1][c] [1995]). The court described the relationship between the tenants and their subsidized housing as fol-

lows: "Tenants of public and subsidized housing pay rent that is set at well below market rates, and they also can have their rental obligation reduced to reflect an adverse change in their income. Tenants of public and subsidized housing also have the advantage of greater procedural protections against eviction than tenants of private housing." *Dowell* v. *Commissioner of Transitional Assistance, supra* at 615 (citations omitted). None of these characteristics pertains to the plaintiffs or their apartments. Other Department of Transitional Assistance regulations define subsidized housing as any housing occupied under the Federal section 8 program, the Massachusetts rental voucher program, the Massachusetts teen structured living program, 106 Code Mass. Regs. § 705.910(c)(1)-(3) (1997), or "other state or federally funded program, in which the rent of at least one of the occupants is based in whole or in part on a percentage of his or her income." 106 Code Mass. Regs. § 705.910(c)(4) (1997). See 803 Code Mass. Regs. § 5.01 (1995) ("Subsidized housing program means any program of rental assistance for low and moderate income persons funded by the state or federal government"). These are the kinds of programs which are unaffected by the abolition of rent control.

In *Quinn* v. *Rent Control Bd. of Peabody*, 45 Mass. App. Ct. 357, 377 (1998), a case concerning the applicability of the exemption for "mobile homes" in G. L. c. 40P, § 3(*c*), to the " 'lots' or 'pads' on which the mobile homes sit," 45 Mass. App. Ct. at 376, this court concluded that the terms "public and federally assisted housing" in the context of § 3 refer to "fields that have been highly regulated to provide affordable housing for exigent classes of citizens, and there is reason to believe that the Legislature would be loath to withdraw any of them from rent control." 45 Mass. App. Ct. at 377.

None of these considerations applies to the plaintiffs' apartments. In the absence of rent control, these are market rate apartments. The defendant did not pass any of its c. 121A subsidy on to its tenants in the form of reduced rent. Indeed, subsidized housing was not one of the designated goals of redevelopment under c. 121A until 1975, well after the apartments at issue here had been constructed. See St. 1975, c. 827, § 7.

Other statutory and regulatory provisions support this definition of subsidized housing. In the low and moderate income housing sections of G. L. c. 40B, subsidized housing means

"housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing." *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 654 (1982), quoting from G. L. c. 40B, § 20. The Massachusetts Housing Finance Agency (MHFA) makes "rental determinations" for publicly financed private housing projects, requiring a low- or moderate-income resident to pay "below-market rate rental." St. 1966, c. 708, § 6. St. 1975, c. 643, § 3 ("the MHFA may operate an interest subsidy program . . . . on behalf of the low and moderate income persons and families . . . to be applied towards rent payments"). See generally Garrity, Poverty Law, 1970 Ann. Surv. Mass. L. § 10.7, at 232 (discussing MHFA and c. 121B programs); McCarthy & Aluise, Preservation of Affordable Housing, 34 Boston B. J. 3 (Aug. 1990) (discussing Federal and State rental assistance programs and the critical role of public subsidies to the creation of affordable housing).

The plaintiffs' interpretation of G. L. c. 40P, § 3(*c*), is not only inconsistent with the words of the relevant statutes taken in context, see *Nyhan* v. *Retirement Bd. of Lawrence*, 39 Mass. App. Ct. 914, 916 (1995), it is also inconsistent with the intent of the recently enacted statutes abolishing rent control: "to establish a uniform statewide policy for ending rent control," St. 1994, c. 282, § 1, "[by] broadly prohibit[ing] any regulatory scheme based upon or implementing rent control," G. L. c. 40P, § 2. "It can be assumed that new legislation alters existing law." *Morrison* v. *Lennett*, 415 Mass. 857, 863 (1993). "We must presume that the Legislature was aware of pre-existing law, including c. 121A," *Prudential Ins. Co. of America* v. *Boston*, 369 Mass. at 546, when it enacted c. 282. Moreover, c. 40P mandates that "this chapter shall be liberally construed to effect [its] purpose [of prohibiting rent control]." G. L. c. 40P, § 2. The plaintiffs' proposed interpretation — that publicly subsidized housing means any residential building receiving any kind of public financial assistance, whether or not that assistance is passed on to tenants in the form of reduced rents — is inconsistent with this mandate and with the purpose of c. 40P. See *Nyhan* v. *Retirement Bd. of Lawrence*, 39 Mass. App. Ct. at 916.

(*c*) *Contract claim.* In the agreement regarding "rental status," the defendant agreed "(1) to maintain the rental status of the Residential Project . . . until August 31, 2001; and (2)

not to seek conversion of any of the Residential Project; said buildings, or their apartments, to condominium or cooperative status prior to August 31, 2001." In allowing the defendant's motion for summary judgment on the contract claim, the Superior Court judge found that the term "rental status" in the context of the "surrounding language" of the one-page "agreement" was not ambiguous. The plaintiffs argue that the agreement is merely a "partial memorialization" of the contract because only the defendant signed the document and there is no indication that the plaintiffs agreed to its wording. Even were we to agree that the single page "agreement" is ambiguous as to the meaning of the words "maintain the rental status," an examination of the entire record before the Superior Court judge makes clear that "rental status" meant just that — the plaintiffs could continue to rent their apartments until the expiration of the c. 121A agreement without fear of conversion. See *Wagley* v. *Danforth,* 46 Mass. App. Ct. 15, 17-18 (1998).

The termination agreement, to which the "rental status" agreement was attached, refers to the tenants' concerns about rental status "due to the history of attempts made to convert residential apartments in the [e]xisting [p]roject to condominiums or cooperatives," see *Bronstein* v. *Prudential Ins. Co. of America,* 390 Mass. at 702, and provides that the BRA "shall not entertain or approve any application and restricts the [defendant] from submitting any application to convert the [r]esidential [p]roject to condominium or cooperative status." In a December 7, 1990, letter, counsel for the tenants' association confirmed that the tenants agreed to testify before the BRA on the defendant's behalf in exchange for the defendant's "binding commitment that the current Prudential apartments will remain as rental units." At the BRA hearing, the tenant representative testified that the tenants supported the defendant's application to terminate the Prudential redevelopment project on the basis of the defendant's "binding assurance to the residential tenants that the apartments will remain as rental units until at least August, 2001." Viewed in this context, the meaning of the words "rental status" is plain: the tenants may continue to rent their apartments until the expiration of the c. 121A contract. There is no promise here that the tenants continue to have the benefit of rent control. Indeed, as plaintiffs' counsel acknowledged at the hearing in Superior Court on the summary judgment motions, at the time of the "rental status" agreement,

"[n]o one knew that the people of Massachusetts were going to say we're going to get rid of rent control throughout the Commonwealth."

Nor is there merit to any of the plaintiffs' other arguments. There was no failure of consideration. General Laws c. 121A, § 18D, prohibits conversion of 121A rental housing to condominiums. It does not prohibit conversion to cooperatives. *Bronstein* v. *Prudential Ins. Co. of America,* 390 Mass. at 703. The plaintiffs' argument about the "common understanding" of the terms in G. L. c. 40P misses the point of the initiative petition entirely. Nor could the plaintiffs prevail on the argument about the application of the summary judgment standard to their contract claim, even if it reached the level of appellate argument, which it does not. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

*Judgment affirmed.*